Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
BRODSKY & SMITH, LLC
9595 Wilshire Blvd., Ste. 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON FREEMAN, <br><br> Plaintiff, <br><br> vs. <br><br> FIBRE RESOURCES UNLIMITED, INC. a/k/a FIBRE RESOURCES, and CERTIFIED RECYCLING, INC. <br><br> Defendant. | Civil No. **'20 CV2029 JAH  KSC** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.) <br><br> **JURY TRIAL DEMAND** |

Plaintiff Clayton Freeman ("Plaintiff"), by and through his counsel, alleges as follows:

1.    This is a citizen suit, brought pursuant to the section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by defendants Fibre Resources Unlimited a/k/a Fibre Resources and Certified Recycling, Inc., (collectively, "Fibre Resources" or the "Defendants") arising out of operations at Fibre Resources' facility located at 3833 Bancroft Drive, Spring Valley, CA 91977 (the "Facility").

2.     Since at least March 16, 2015, Defendants have been discharging and continues to discharge polluted stormwater from the Facility in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and in violation of the General Industrial Stormwater Permits issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "Industrial Stormwater Permit" or "IGP").

3.     Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendants' repeated and ongoing violations of the Clean Water Act.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5.     On March 16, 2020, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided notice of intent to file suit against Defendants for CWA violations ("NoV") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") collectively, "state and federal agencies") and Defendants.

6.     The NoV provided Defendants with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendants violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the date, location, and person responsible for the violation(s), and (iv) the contact

information for the Plaintiff and Plaintiff's Counsel.  A copy of the NoV is attached as Exhibit 1.

7.      More than sixty (60) days have passed since the NoV was served upon Defendants and the state and federal agencies.  During this time, neither the EPA, nor the State of California, has commenced or is diligently prosecuting a court action to redress the violations alleged herein.  No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.      Venue is proper in the Southern District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

9.      Plaintiff is a citizen of the State of California who, through his recreational activities, uses and enjoys the waters of the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.  Plaintiff's use and enjoyment of these waters is negatively affected by the pollution caused by Defendants' operations.  Plaintiff is dedicated to protecting the water quality of the Sweetwater River, Sweetwater Reservoir, San Diego Bay, and the overall Sweetwater River Watershed, for the benefit of its ecosystems and communities.  To further these goals, Plaintiff actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of himself and for his community.

10.     Plaintiff, like other citizens, taxpayers, property owners, and residents of his community, lives, works, travels near, and recreates in, the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the

Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part, into which Defendants discharge pollutants.  Plaintiff, like other citizens, taxpayers, property owners, and residents, uses and enjoys the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part, for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes.  Defendants' discharge of stormwater containing pollutants impairs each of these uses.  Thus, Plaintiff's interests have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the Industrial Stormwater Permit.

11.     Plaintiff enjoys going to the Sweetwater Summit Regional Park (the Park").  Plaintiff enjoys relaxing in the park and walking along the paths located in the Park.

12.     The Sweetwater River runs, and the Sweetwater Reservoir (a dammed portion of the Sweetwater River) is located, and directly adjacent to the Park, and the both are accessible from the Park by Park goers to recreate and fish in.  While at the Park, Plaintiff has witnessed the polluted nature of the Sweetwater River and Sweetwater Reservoir.  He has observed that the Sweetwater River and Sweetwater Reservoir appears both brown and dirty.  In addition to his visual observation of the water, Plaintiff has also noticed an unpleasant smell coming from the water.

13.     Plaintiff is aware that Defendants' Facility is located a short distance away upstream from the Park and that the pollution contained in stormwater runoff from the Facility flows downstream through the Sweetwater River, Sweetwater Reservoir, and the Park before ultimately reaching the San Diego Bay and Pacific Ocean.  Plaintiff believes that this has degraded the beauty of the Park and curtailed his enjoyment of the Park.

14.    Plaintiff intends to return to the Park in the future and believes that reducing Defendants' pollution of the Sweetwater River watershed will improve the water quality in the Sweetwater River and Sweetwater Reservoir and allow him the opportunity to better enjoy the recreational and aesthetic interests in the Sweetwater River, Sweetwater Reservoir, and the Park.

15.    Defendant Fibre Resources Unlimited, Inc. a/k/a Fibre Resources is a California corporation with headquarters at 555 S. Rose Street, Anaheim, CA 92805.

16.    Defendant Certified Recycling, Inc. is a California corporation with headquarters at 555 S. Rose Street, Anaheim, CA 92805.

17.    Defendants own and operate the Facility, located at 3833 Bancroft Drive, Spring Valley, CA 91977.

18.    The Facility operates as a recycling and waste facility.  Industrial activities carried out at the Facility include (i) recycling of paper, plastic, metals, and other items; (ii) waste solution management; (iii) product destruction; (iv) equipment storage; and (v) shipping and receiving.  Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

19.    The Facility's industrial activities fall under Standard Industrial Classification ("SIC") Code 5093, relating to Scrap and Waste Recycling. Defendants applied for and received coverage under the California Industrial General Permit since at least 2013, and was issued WDID No. 9 37I024288. Defendant reapplied for coverage under the 2015 Industrial Stormwater Permit, and was granted the continued use of its previously issued WDID No.  These "Notice of Intents" for the Facility to comply with the terms of the Industrial Stormwater Permit list "Fibre Resources" as the Facility name and "3833 Bancroft Drive, Spring Valley, CA 91977" as the Facility address.  Moreover, the physical signage displayed at the aforementioned address describes the Facility as "Certified Recycling".  Plaintiff is

PLAINTIFF'S COMPLAINT

therefore informed and believes and thereon alleges that Defendants jointly and severally own and/or operate the Facility.

## REGULATORY BACKGROUND

*The Problem of Stormwater Pollution*

20.     Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.  With every rainfall event, significant amounts of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and directly into the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.

21.     Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life.  In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate plus nitrite nitrogen.  Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects.  Heavy metals have been shown to alter activity in tissues and blood of fish.

22.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.  TSS has been shown to alter predator/prey relationships (for example, turbid water might make it difficult for fish to see their prey).  Deposited solids alter habitat for fish, aquatic plants, and benthic organisms.  TSS can also be

PLAINTIFF'S COMPLAINT

harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS.   Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.   Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

23.   CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA requirements.   Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

24.   CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA approved permit program for discharges.   In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State.   The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

25.   CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for stormwater discharges "associated with industrial activity."

26.   CWA section 301(b) required that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.   *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

PLAINTIFF'S COMPLAINT

27.    CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

28.    CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a).

29.    CWA violators are subject to an assessment of civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

***State Regulations***

30.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States.  The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.  *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

31.    The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

32.    Water Quality Objectives ("WQO") applicable to Defendant are set forth in the California Toxic Rule ("CTR")[1] and the San Diego Region (Region 9) Water Quality Control Plan (the "Basin Plan").  Exceedances of WQOs constitute violations of the Industrial Stormwater Permit, the CTR, and the Basin Plan.

---

[1] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000).

33.   The Basin Plan establishes WQOs for all various areas of the inland surface, enclosed bays and estuaries, coastal lagoons, and ground waters under the purview of the San Diego Regional Water Quality Control Board, including the waters of the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part, including but not limited to the following:

a.   Waters shall not contain suspended or settleable material in concentrations that create nuisance or adversely affect beneficial users;

b.   Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses;

c.   All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, or aquatic life.

34.   In addition, the EPA has promulgated WQOs for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which include and apply to the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part, unless expressly superseded by the Basin Plan.  65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

**The Industrial Stormwater Permit**

35.   In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity.  On April 17, 1997, the State Board adopted the 1997 Permit, which was in effect through June 30, 2015.  On July 1, 2015, the 2015 Permit became effective

PLAINTIFF'S COMPLAINT

and superseded the 1997 Permit, except for enforcement purposes.[2]  To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.   1997 Permit, p. II; 2015 Permit, Section I(A)(Findings 8, 12).

36.   The Industrial Stormwater Permit is an NPDES permit issued pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).   Violations of the Industrial Stormwater Permit are also violations of the CWA.  1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

37.   The   Industrial   Stormwater   Permit   contains   certain   absolute prohibitions.   The Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Order Part A(1); 2015 Permit, Section III(B).   The Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance (1997 Permit, Order Part A(2); 2015 Permit, Sections III(C), VI(C)) and discharges that adversely impact human health or the environment (1997 Permit, Order Part C(1); 2015 Permit, Section VI(B)).   Finally, the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  1997 Permit, Order Part C(2); 2015 Permit, Section VI(A).

38.   On April 1, 2014, the State Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No.

---

[2] Notably, the 2015 Permit is much more comprehensive than its predecessor, including expanding its purview to "Light Industry" uses previously exempted, and including more prescriptive requirements for various parts of permit compliance, including BMPs, NALs, SWPPP requirements, Total Daily Maximum Loads for receiving waters, amongst others. *See generally,* 2015 Permit.

2014-57-DWQ, effective as of July 1, 2015.  As of the effective date, Water Quality Order No. 2014-57-DWQ supersedes and rescinds the current Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ, except for purposes of enforcement actions brought pursuant to the Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ.

39.   Notably, under the 2015 Permit, all "Light Industry" facilities falling under SIC where industrial materials, equipment, or activates are not exposed to stormwater are now required to obtain coverage under the IGP. [3]

40.   Under the CWA and the Industrial Stormwater Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution.  33 U.S.C. § 1311(b); 1997 Permit, Order Part B(3); 2015 Permit, Section X(H).  The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards.  Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

41.   The 2015 Permit includes Numeric Action Limits (NALs) that are based on Benchmarks.  2015 Permit, Section I(M) (Finding 62).  Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." *Id.*  Section I(M) (Finding 61).

42.   Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.  1997 Permit,

---

[3] Light Industry" facilities are included in the category of "Manufacturing Facilities" defined in the Industrial Stormwater Permit as "Facilities with Standard Industrial Classifications (SICs) 20XX through 39XX, 5221 through 4225."[3]  *See*, Industrial Stormwater Permit, Attachment A, Category 2.

Section A(1)(a) and Order Part E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit, Section X(G).  The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges.  1997 Permit, Section A(2); 2015 Permit, Section X(H).  The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT.  1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A).

43.    The SWPPP must include:  a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP.  1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

44.    The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial

Stormwater Permit and requirements of the SWPPP at all times.   1997 Permit, Section C(5); 2015 Permit, Section XXI(F).

45.   The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness.   1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

46.   The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility.   1997 Permit, Section B(1)-(2) and Order Part E(3).   The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id*. at Section B(2).   The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP.   *Id*.

47.   Facilities are required to make monthly visual observations of storm water discharges.   The visual observations must represent the quality and quantity of the facility's storm water discharges form the storm event.   1997 Permit, § B(7); 2015 Permit, § XI.A.

48.   The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit.   2015 Permit, Sections I(J) (Findings 55-56); XI.

49.   Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."   1997 Permit, § B(5)(c)(ii).   Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the

presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

50.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges.  1997 Permit, Sections B(3)-(4); 2015 Permit, Section XI(A).  Facility operators must collect samples of stormwater discharges from all locations where stormwater may be discharged from the facility.  1997 Permit, Sections B(5), (7); 2015 Permit, Section XI(B)(4)-(5). As a part of MRP, these collections and analyses must be conducted twice a year; samples must be collected during "the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season." *Id.*  Through the 2014-2015 reporting period, facility operators were required to analyze stormwater samples for pH, total suspended solids, total organic carbon (or oil and grease as a substitute), specific conductance, toxic chemicals, and other pollutants which are likely to be present in significant quantities in stormwater discharging from the facility.  1997 Permit, Section B(5).

51.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

52.     The EPA has established the Benchmark values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *See*, U.S. EPA Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP").  These Benchmarks represent pollutant concentrations at which a storm water discharge

could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  Notably, the Benchmark levels contained in the MSGP is "consistent" with the BMPs required of facilities under the Industrial Stormwater Permit, and serve as the reference point for the Numeric Action Levels ("NALs") contained in the IGP itself.  2015 Permit I(D)(33).

53.     These Benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs").  The 2015 Permit incorporates annual NALs, which are derived from a Water Board dataset.  The following NALs have been established under the 2015 Permit for facilities under SIC code 5093: (i) Oil & Grease – 15.0 Mg/L; (ii) Total Suspended Solids ("TSS") – 100 Mg/L; (iii) Aluminum – 0.75 Mg/L; (iv) Lead – 0.262 Mg/L ; (v) Iron – 1.0 Mg/L; (vi) Zinc – 0.26 Mg/L; and (vii) Chemical Oxygen Demand – 120 Mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also established the following instantaneous maximum NALs for all permitted facilities: (i) pH – 6.0 – 9.0 s.u.; (ii) TSS – 400 Mg/L; and (iii) Oil & Grease – 25 Mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources,

or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

54.    Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  2015 Permit, Fact Sheet, Paragraph O.

55.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.  *See also* 40 C.F.R. §§ 19.1 -19.4.

## STATEMENT OF FACTS

*Facility Background*

56.    Defendants operate the Facility located at 3833 Bancroft Drive, Spring Valley, CA 91977.

57.    The Facility is regulated by the Industrial Stormwater Permit.

58.    Defendant submitted or was covered by a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board since at least 2013 and in 2015.

59.    Operations at the Facility include recycling and waste management. Industrial activities carried out at the Facility include (i) recycling of paper, plastic, metals, and other items; (ii) waste solution management; (iii) product destruction; (iv) equipment storage; and (v) shipping and receiving.  Repair and maintenance

activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

60.   Certain operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

61.   Specifically, plaintiff is aware of industrial processes at the Facility exposed to stormwater, including, but not limited to:

 a. The storage of large amounts of industrial machinery and products outdoors and not under cover (many of which display visible signs of weathering damage, such as rust), including such specific items as:

  i.   Large amounts of pallets;

  ii.  Large amounts of paper and cardboard waste bales;

  iii. Large amounts of refuse;

  iv.  Loose unsecured paper waste;

  v.   Large amounts of metal and metal scrap waste, much of which displays rust;

  vi.  Chemical Drum containers;

  vii. Forklifts;

  viii. Shipping Containers;

  ix.  Dumpsters; and

  x.   Trucks.

 b. The carrying out of industrial processes outdoors and not under cover, including the use of the industrial machinery and products mentioned above; and

 c. The storage of industrial waste and refuse outdoors not under cover and exposed to stormwater, including the use of dumpsters, trash cans, and accumulation of waste.

62.     Vehicles and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

63.     The types of pollutants released by the Facility into the immediate environment are known to include, or have the potential to include, among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals, and other pollutants.

64.     The industrial materials stored and the pollutants generated at the Facility are exposed to stormwater flows.

65.     Activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility.  During rain events, this pollution washes off of those surfaces and flows into the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.  Stormwater from the Facility discharges into the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.

***Activities Contributing to CWA Violations***

66.     Defendants have not developed and/or implemented an adequate SWPPP at the Facility, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

67.     Defendants have not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

68.     Defendants have not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

69.     Defendants have not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

70.     Defendants have not developed and/or implemented adequate BMPs necessary to reduce or eliminate stormwater pollution that constitute BAT/BCTs, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

71.     Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

72.     Defendants has not adequately evaluated and revised the Facility's SWPPP to address these failures, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.  Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

73.     Defendants have not developed and/or implemented an adequate MRP at the Facility which has resulted in practices that do not adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

74.     Defendants' monitoring activities, or lack thereof, have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP, as evidenced by the various violations stated above, at ¶¶ 59-65 *supra*.

75.     Defendants have failed to address these issues in the ERA process as proscribed by the IGP, as evidenced by the various continuous and ongoing violations stated above, at ¶¶ 59-65 *supra*.

76.     Due to Defendants lack of effective pollution prevention measures, including effective BMPs, and their failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents.   The potential pollutants from the Facility include among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals such as Iron, Aluminum, Lead, and Zinc, and other pollutants.   Stormwater from the Facility discharges, via the local storm sewer system and/or surface runoff, directly into the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.

77.     Polluted stormwater is discharged from the Facility into the Sweetwater River, its inflows, outflows, including the Sweetwater Reservoir and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, of which the Sweetwater River, Sweetwater Reservoir, and San Diego Bay are a part.   The Sweetwater River, Sweetwater Reservoir, and the San Diego Bay, and other waters of the overall Sweetwater River Watershed, are waters of the United States.

78.     Defendant's stormwater testing for the required pollutant parameters during the five years before Plaintiff served the NoV upon was wholly insufficient – in fact, the Defendant failed to submit the required stormwater testing for any Qualifying Storm Event ("QSE") in any of the five previous annual reporting periods prior to the date of the NoV, submitting no testing at all in the annual reporting period immediately prior to the issuance of the NoV.   As stated in the Industrial

Stormwater Permit, facilities are required to provide testing data, for all requisite NALs, for four QSE's per year.[4]

79.    In addition, the testing which was submitted by Defendants indicate that the Facility is discharging stormwater with higher than acceptable levels of pollutants, specifically recording annual NAL exceedances for the pollutant parameters of Iron, Aluminum, and Chemical Oxygen Demand in the 2016-2017 annual reporting period and for the pollutant parameters of Zinc and Chemical Oxygen Demand in the 2017-2018 annual reporting period.

80.    Due to these overages as well as the lack of proper testing over a five year period, it is likely that the pollutants of pH, O&G, TSS, Chemical Oxygen Demand, Iron, Aluminum, Lead, and/or Zinc, are present in the Facility's stormwater runoff far exceeding acceptable levels.

81.    Additionally, as stated in the NoV, because Defendants have failed to properly address any potential insufficiencies with their IGP compliance at the Facility through the ERA process proscribed by the IGP – a process that is designed to allow Facilities to take measured and demonstrative action to fix issues presented by pollutant overages present in stormwater testing results.

82.    Moreover, the pollutants associated with SIC code 5093 are particularly dangerous to riverine ecosystems, including Oil & Grease, TSS, pH, Chemical Oxygen Demand, and heavy metals such as Iron, Aluminum, Lead, and Zinc. Failures to adequately test stormwater runoff, as is the case here, make it difficult to determine both the amount of pollutants being discharged in a facility's stormwater, and the efficacy of any control measures put in place.

83.    In addition, in the time since the NoV has been served on Defendant, the Facility's has continued to ignore its obligations under the IGP, failing to upload testing data for all required testing data in the 2019-2020 annual reporting period.

---

[4] Under the Previous Industrial Stormwater Permit, this requirement was two QSEs per year.

PLAINTIFF'S COMPLAINT

84.     Furthermore, despite these numerous issues with IGP compliance, the Facility has not properly updated its SWPPP, a document now five years old and consisting of only nine pages, much of which is generalized information non-specific to the Facility.

85.     Such failure to comply with the self-monitoring and testing standards of the IGP undercuts the design of the IGP and the ERA scheme which rely on self-monitoring and reported testing to require self-remediation at Facility's monitored by the Regional Board.  By failing to comply with such testing standards, Defendants have failed and is continuing to fail to create and implement adequate BMPs representing BATs and BCTs in place at the Facility, thereby violating the IGP and CWA.

86.     Due to these numerous insufficiencies, discrepancies, and overages contained in the Defendants' annual stormwater sampling, the Facility's discharges of stormwater have been, are, and are likely to continue to be regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT, and are thus violative the IGP and CWA.

## FIRST CAUSE OF ACTION

**Discharges in Violation of Permit Prohibitions of the Industrial Stormwater Permit**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

87.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

88.     The Industrial Stormwater Permit requires that "All Discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit."

89.     Since at least March 16, 2015, Defendants have been discharging polluted stormwater from the Facility in violation of the Prohibitions of the Industrial

Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain).  *See* Exhibit 1, NoV at Attachment 3

90.   The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the Industrial Stormwater Permit.

91.   Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the Industrial Stormwater Permit and the Water Quality Objectives set forth in the Basin Plan.

92.   Each day since at least March 16, 2015, that Defendants have discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

93.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

94.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm he has no plain, speedy, or adequate remedy at law.

95.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Effluent Limitations of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

96.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

97.    The Industrial Stormwater Permit's SWPPP requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

98.    Defendants have discharged and continue to discharge stormwater from the Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event occurring from March 16, 2015 through the present.  Defendants' failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial Stormwater Permit and the CWA. *See* 1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

99.    Each day since at least March 16, 2015, that Defendants have discharged stormwater containing pollutants in violation of the Industrial Stormwater Permit, specifically Effluent Limitation B(3) of the 1997 Permit, is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

100.    Defendants' CWA violations described in the paragraphs above will continue in the future until Defendants develop and implement BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

101.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

102.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

103.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### THIRD CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan, In Violation of the Industrial Stormwater Permit (Violations of 33 U.S.C. § 1311, 1342)**

104.   Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

105.   The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP when they commence industrial activity.  1997 Permit, Section A(1); 2015 Permit, Section X(B).

106.   Defendants, as of at least March 16, 2015, have commenced industrial activity and continues to conduct industrial activity at the Facility.

107.   Defendants has failed and continue to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the Industrial Stormwater Permit.

108.   Defendants have failed and continue to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of the Industrial Stormwater Permit, specifically Section A of the 1997 Permit and Section X of the 2015 Permit.

109.   Defendants have failed and continue to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the

Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit.

110.   Each day since March 16, 2015, that Defendants have failed to adequately develop and/or implement a SWPPP for the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

111.   Defendants have been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since March 16, 2015.  Defendants will continue to be in violation of the SWPPP requirements each day that Defendants fail to develop and fully implement an adequate SWPPP for the Facility.

112.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

113.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

114.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program, In Violation of the Industrial Stormwater Permit (Violations of 33 U.S.C. §§ 1311)**

115.   Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

116.   Defendants have discharged and continues to discharge pollutants from the Facility in violation of the Industrial Stormwater Permit.  Defendants are also in

PLAINTIFF'S COMPLAINT

violation of the Industrial Stormwater Permit for repeated failure to report proper annual stormwater discharge data as required by the Industrial Stormwater Permit. Thus, Defendants' discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

117.   Defendants have been in violation of CWA section 301(a) every day they have discharged stormwater from the Facility to waters of the United States since March 16, 2015.  Defendants will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the Facility to waters of the United States.

118.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

119.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

120.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **RELIEF REQUESTED**

Plaintiff respectfully requests this Court to grant the following relief:

A.      Declare Defendants to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best

Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the IGP;

B.    Enjoin Defendants from discharging pollutants from the Facility to stormwater discharge points, which discharge to the Sweetwater River, its inflows, Sweetwater Reservoir, San Diego Bay, and other waters of the overall Sweetwater River Watershed;

C.    Order Defendants to restore all receiving waters damaged by Defendants' illegal discharges of pollutants from the Facility;

D.    Enjoin Defendants from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

E.    Order Defendants to pay civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4;

F.    Award Plaintiff his costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d);

G.    Award such other relief as this Court may deem appropriate.

//
//
//
//
//
//
//
//

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

October 15, 2020

BRODSKY & SMITH, LLC

By:

Evan J. Smith, Esquire (SBN242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:   (877) 534-2590
Facsimile:   (310) 247-0160

*Attorneys for Plaintiff*

PLAINTIFF'S COMPLAINT